**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE**

**CIVIL ACTION NO. 3:05CV-220-MO**

| | |
|---|---|
| RONALD R. GAW, Administrator of the Estate of CLINT C. GAW, Deceased, | PLAINTIFFS |
| AND | |
| ALEXIS FRANCISCO, by and through her mother, guardian, and next friend, ROBIN FRANCISCO, | |
| AND | |
| RILEY GAW, by and through his mother, guardian, and next friend, MEGAN NEWTON | INTERVENING PLAINTIFF |
| V. | |
| CSX TRANSPORTATION, INC. | DEFENDANT |

**MEMORANDUM OPINION**

This case arises from an accident at a railroad crossing that ended the life of Clint Gaw and caused permanent and severe injuries to his infant son, Riley Gaw. Mr. Gaw's estate, and the mothers of his son and daughter have sued CSX Transportation, Inc., the owner of the tracks on which the accident occurred and the owner and operator of the train that killed Mr. Gaw. The plaintiffs and intervening plaintiff (collectively, the "plaintiffs") allege that CSX negligently failed to keep the crossing safe for use by members of the public and negligently failed to warn Mr. Gaw of approach of the train that killed him. At the close of discovery, CSX filed a motion for summary judgment in which it asserted that it violated no legal duty it owed to the plaintiffs.

The court has reviewed the motion for summary judgment, all responses thereto, the evidence of record, and the applicable law, and has listened carefully to the oral arguments of

counsel. Being fully advised, and yet sadly aware of the tragic consequences of the accident to Clint and Riley Gaw's families, the court agrees with CSX transportation that it is entitled to summary judgment in its favor. For the reasons stated herein, the court finds that the crossing was a private one and that the evidence in the record does not support a finding that the crossing was extra-hazardous or habitually and pervasively used. CSX's duties to anyone traversing the crossing therefore were extremely limited, and the evidence presented by the plaintiffs simply does not support a finding that CSX breached any of those limited duties.

## I.

On February 24, 2005, shortly after 4:00 p.m., Clint Gaw attempted to cross railroad tracks that bisect a gravel driveway that is the sole means of vehicular access to two private farms and a small used-car lot operated by one of the landowners next to his barn. Mr. Gaw had just left the used-car lot, and riding in his pickup truck with him were his girlfriend, Megan Newton, and their six week old son, Riley Gaw. While he was crossing the tracks, a train struck Mr. Gaw's truck, killing him, injuring Ms. Newton, and causing debilitating and lasting injuries to their son, Riley.

Although the train operated by CSX literally caused the death of Mr. Gaw and the injuries to his son and girlfriend, the question of whether CSX is legally responsible for the tragedy is an issue of far more nuance. At public crossings, railroads have clearly-defined duties to provide appropriate warnings of oncoming trains and to ensure that view-blocking vegetation is cleared near the crossing to help maintain the safety of persons who cross the tracks. A railroad's responsibilities at private crossings are much more limited – so much so that in all but

the rarest circumstances, they are practically non-existent.[1] The questions for this court are therefore whether the crossing in question was, as a matter of statutory law, a private or public crossing. If the former, the court must then determine whether, as a matter of common law, additional duties like those required at public crossings should be imposed on CSX because of the high-frequency of the crossing's use by the public. If not, then the court must determine whether the evidence supports a finding that, although the crossing was a private one, it was extra-hazardous, and for that reason certain duties that would not otherwise exist should be imposed on CSX. If the crossing was not extra-hazardous, the court must determine whether CSX customarily provided warnings at the crossing even though it had no obligation to do so, and, if so, whether Mr. Gaw relied on the warnings because of past experience at the crossing, and, if so, whether CSX failed to provide the relied-upon warning before the accident. The court will now evaluate each issue in turn.

## II.

CSX's alleged legal responsibility for the accident that killed Mr. Gaw and injured his son and girlfriend depends on the nature and extent of the statutory and common law duties imposed on the railroad with respect to the crossing. In both the original and the intervening complaints, the plaintiffs allege that CSX had the duty and failed to adequately warn Clint Gaw of the approach of the train. In the complaint, Mr. Gaw's estate and his daughter generally allege that CSX had a duty and failed "to maintain its property in a reasonably safe condition"

---

[1] At a private crossing a train operator has little, if any, more than the duty to use ordinary care to avoid injuring a person or motorist on the tracks, if he discovers the person or vehicle in time to avoid injury. *See, e.g., Louisville & N. R. Co. v. Wallace*, 302 S.W.2d 561 (Ky. 1957).

for passage.[2] Similarly, in their intervening complaint Megan Newton and Riley Gaw also generally allege that CSX had the duty and failed "to keep the crossing safe for human passage."[3] In their response to CSX's motion for summary judgment, the plaintiffs provided more specificity to their claims and asserted that CSX had, in particular, created an extra-hazardous crossing by not clearing the vegetation surrounding the crossing to permit an appropriate line of sight in the absence of any warning, by failing to maintain an appropriate slope in the area immediately adjacent to the tracks, and by failing to maintain the area immediately adjacent to the track, which caused that area to be rough and uneven and distracted drivers from their more pressing task of keeping adequate lookout for oncoming trains. Whether any of these allegations is supported by sufficient evidence to warrant submission to a jury depends in part on the resolution of certain issues of law. Before resolving those issues, however, it is worth stating the standard for summary judgment in federal court.

It should be well known to all in the legal community by now, but it nonetheless bears repeating that, in a diversity action such as this, the court looks to federal, not state, law for its summary judgment standard. In federal courts, summary judgment as a matter of law is proper only where there exists no genuine issue of material fact. FED. R. CIV. P. 56 (c). This court, sitting in diversity, is not bound by Kentucky's "impossibility" standard.

In considering a motion for summary judgment, this court must construe the evidence and draw all reasonable inferences in favor of the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and determine "whether the evidence

---

[2]Complaint, at ¶ 7.

[3]Intervening Complaint, ¶¶ 8-9.

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The party bearing the burden of proof on a particular issue – regardless of whether he is the movant or non-movant – cannot rely on mere allegations or conclusory statements, however. *See Maki v. Laako*, 88 F.3d 361, 364 (1996). He must point to in the record, or proffer, actual evidence. *Id.* What's more, the relied upon evidence must fit within certain parameters. It must be "of an evidentiary quality that demonstrates the existence of a genuine issue of material fact." *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997)(emphasis added). To be of evidentiary quality, "[t]he proffered evidence need not be in admissible form, but its content must be admissible." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)(emphasis in original omitted)).

The court will now evaluate whether CSX is entitled to judgment in its favor.

**A.     Was the Crossing a Public or Private One?**

A railroad company has specific duties to warn, and provide lookout for, traffic at public crossings. These duties vary in scope and degree depending on the particular public crossing, and are mandated by statutory and common law. *See, e.g.,* Ky. Rev. Stat. 227.160 and 227.190 and *Bibbs v. Kentucky & Indiana Terminal R.R.*, 300 S.W.2d 229 (Ky. 1957). The statutory requirements for public crossings do not apply to private crossings, however, and the general rule in Kentucky has long been established that there exists no duty to warn, provide lookout, or clear view obstructing vegetation at a private crossing. *See, e.g., Hunt's Adm'r v. C&O Ry. Co.*,

254 S.W.2d 705, 706-07 (Ky. 1952); *Hess's Adm'r v. Louisville & N.R. Co.,* 61 S.W.2d 299 (Ky. 1933); and *Spalding v. Louisville & N.R. Co.*, 136 S.W.2d 1, 2-3 (Ky. 1940).

Whether a crossing is a public or private one is governed principally by statute. Plaintiffs assert that a railroad's decision to erect warning devices at a crossing, in and of itself, can convert a private crossing into a public one, and require the railroad to assume all public crossing duties. In support of their position, they cite two cases, neither of which, if read carefully, is helpful to their argument.[4] The first, *Louisville & N. R. Co. v. Foster*, 18 S.W.2d 983, 985 (Ky. 1929) was decided thirteen years before the enactment of Ky. Rev. Stat. 177.010, which supercedes any noteworthy dicta in the case. The second, *Louisville & N.R. Co. v. Blanton,* 200 S.W.2d 133, 135 (Ky. 1947), is factually inapposite. It that case, as required by Ky. Rev. Stat. 277.060(2) the railway created a new road in place of an old, indisputably public road, that it had partially destroyed when it created its crossing. *Blanton*, 200 S.W.2d at 134-35. Thus, one public road was merely replaced with another. *Id.* Although the municipality had not officially recognized the new road, it built a bridge on it, and thus, it could not fairly be said that, by "voluntarily" complying with Ky. Rev. Stat. 277.190, the railroad assumed public crossing duties at a private crossing.

---

[4]Plaintiffs also cite *Louisville Gas & Elec. v. Roberson*, 212 S.W.3d 107 (Ky. 2006), a case not pertaining to a railroad crossing, for the proposition that a private crossing can effectively be deemed public if the railroad voluntarily assumes certain public crossing duties to warn. As defendants correctly note, this matter is easily distinguishable from *Roberson*. To begin with, *Roberson* involved a pedestrian death on a major public highway in Jefferson County. The government's duty to exercise ordinary care to keep its highways reasonably safe for travel, was a well-established part of Kentucky law and hardly a noteworthy part of the opinion. The arguable "expansion" of the law was the court's decision to hold LG&E liable, as well. Yet, LG&E had contracted with the county to keep the street lamps in working order, and failed to do so. Its liability arose from negligent performance of its contractual duties, which injured a third person. Although this holding has sparked interesting legal conversations in the Commonwealth, it does not support plaintiffs' assertion that CSX, which was under no contractual duty to keep a private crossing safe for motorists, somehow assumed any such duty merely by erecting a whistle post and erecting crossbucks.

It therefore remains Kentucky law, that a crossing becomes a public one through the dual means of dedication and incorporation. *See* Ky. Rev. Stat. 177.010(5). In other words, the crossing must be "dedicated to public use" ***and*** incorporated into the state, county, or local road system. *Id.* If crossing does not meet both requirements, it is not a public crossing, and is considered a private one.

Plaintiffs have produced no evidence to support their assertion that the crossing at issue in this case should, as a matter of statutory law, be deemed public. Rather, the evidence of record establishes the opposite. The crossing consists of a partially-paved access road to two private farms and a used car lot operated by one of the farm owners. The road is not a through route, but terminates on the two private farms. It is un-named and unmarked. Although it leads from a public street, it has not been incorporated by the state, county or municipality as part of a public road system, and is maintained solely by the private landowners, not the county or local road departments. Moreover, and although this is not conclusive evidence, it is worth noting that the United States Department of Transportation (DOT-AAR) Crossing Inventory Form lists this particular crossing as a private one. *See* DOT 68, Fed. Reg., No. 59, Thursday, March 27, 2003, page no. 15038. The court therefore finds that there is no basis under statutory law to deem this private crossing a public one.

**B.     Could Certain Public Crossing Duties Be Imposed on CSX with Respect to this Private Crossing Solely Because of the Frequency of its Use?**

Crossings properly considered private under the applicable statutory law can nonetheless be deemed "public," not as a matter of law, but with respect to imposing certain duties on railroad operators that might not otherwise exist. If there is habitual and pervasive public use of an otherwise private crossing, Kentucky common law provides that this may impose any duty to

warn, keep lookout, or slacken locomotive speed on the railroad. The evidence in this matter indicates that, although the existence of the used car lot on one of the farms created somewhat habitual use of the road by persons other than the two landowners and their families, it was not sufficiently pervasive to warrant the imposition of additional duties on CSX under existing Kentucky common law. There is no Kentucky case that holds that the mere existence on one side of a private crossing of a business upon to the public is sufficient to impose certain public crossing duties on a railroad. In addition, although no Kentucky case has provided any bright-line definition to aid making a determination of how many members of the public must daily traverse a private crossing to constitute pervasive use, Kentucky's courts have found that evidence of as few as 60 people and as many as 150 people is *not* sufficient to change by common law a private crossing to an effectively public one. *See Hunt's Adm'r v. Chesapeake & Ohio Ry. Co.*, 254 S.W.2d 705, 707 (Ky. 1952)(citing cases). In this matter, the evidence indicates that the crossing was used by no more than eight to ten persons on a daily basis. Thus, there is no basis in Kentucky law for deeming the small amount of used car lot traffic at the private crossing to be sufficient to impose any public crossing duties on CSX.

Nor can the court reasonably predict that a modern Kentucky court would see things differently. Even absent the determinations in the cases cited previously, such low use cannot practically be deemed pervasive, even if it were habitual. The court therefore finds no basis for determining that the use of the road by visitors to the used car lot was sufficient to impose any duties on CSX.

**C.    Even Though the Crossing Was a Private One, Was CSX Required to Provide Certain Protections to the Traveling Public Because it was Extra-Hazardous?**

There is an additional basis in common law by which a railroad operator can be required to assume certain duties to protect the traveling public at private crossings. If the crossing in question is "extra-hazardous," then a railroad operator may have certain duties to protect persons traversing the crossing, regardless of whether they are few or many.

Plaintiffs assert that myriad factors related to CSX's alleged lack of proper maintenance of the slope and area on and around the crossing rendered the crossing an extra-hazardous one as a matter of law. CSX asserts, however, and the court has not been able to find any case to refute this assertion, that there is only one Kentucky case in which the court applied the "extra-hazardous" doctrine to a private crossing. *See Louisville & N.R. Co. v. Quisenberry,* 338 S.W.2d 409 (1960). In that case, the court noted that when there exist "peculiar or extraordinary circumstances surrounding a crossing and the facts are known to trainmen ... reasonable care may require than an alarm or signal be given by the approaching train." *Id.* at 411. The physical characteristics of the crossing at issue in *Quisenberry* and the facts surrounding the accident were factually quite different from the one at issue in this case, however.

To begin with, the motorist's visibility in *Quisenberry* decreased as he approached the track due to a topographical oddity and the curvature of the road, and other visual aids that might permit the advanced detection of the train were not available to the motorist. *Id.* at 410. These physical features of the area surrounding the crossing, combined with the speed permitted on the road led the court to conclude that it would have been "impossible" for a motorist traveling at a reasonable rate of speed to visually detect an approaching train in time to avoid being struck. *Id.* at 412. For added measure, the train in *Quisenberry* was coasting at the time of the accident,

which greatly reduced any auditory alerts that might otherwise have been available to the motorist. *Id.* at 411.

In this case, the situation is much different. The "road" in question was little more than an extended driveway, at which it would not be reasonable or expected for motorists to approach the intersection at the rate of speed possible in *Quisenberry*. Moreover, according to plaintiffs' own assertions, the road was only partially paved, rough and uneven, and this caused Clint Gaw to operate his truck at a slow rate of speed to avoid waking his sleeping child. Moreover, there was a crossbuck installed by CSX and two stop signs that the landowners had installed before the crossing, and both in front of and just past the allegedly view-obstructing vegetation, to alert motorists of the need to approach the tracks with caution. Lastly, and most importantly, although much has been made of the vegetation present near the track, the evidence presented simply does not support a finding that a motorist stopped at the second of the stop signs, or proceeding at a reasonable rate of speed after passing the sign, lacked sufficient line of sight to visually detect and avoid the approach of an oncoming train.[5] The court thus cannot find as a matter of law that the crossing was extra-hazardous.

---

[5]The court also notes that Kentucky's highest court has held that the duty to clear view-impairing vegetation is not imposed on railroad companies at strictly private crossings. *See Spalding v. Louisville & N.R. Co.*, 136 S.W.2d 1, 2-3 (Ky. 1940); *Gividen's Adm'r v. Louisville & N.R. Co.,* 32 S.W. 612, 613 (Ky. 1895). Given that this court has determined that the crossing at issue here cannot be determined to be a public one under either statutory or common law, the presence or lack of view-obstructing vegetation near the tracks arguably is a non-issue, and certainly not an independent basis for liability, as plaintiffs' assert in their response to CSX's motion for summary judgment.

**D.    Even Though the Crossing Was Private and Not Extra-Hazardous, Did CSX Nonetheless Assume a Duty to Warn Mr. Gaw of the Approach of the Train?**

If it has been the custom of a train operator to give reasonable and timely signals of its approach to private crossings, ***and*** the evidence supports a finding that the particular persons using the crossing were accustomed to rely on the signals, then the railroad operator may be held liable for its failure to sound the customary warning. *See Illinois Central R. Co. v. Maxwell*, 167 S.W.2d 841 (Ky. 1943); *Kentucky Traction & Terminal Co. v. Brawner,* 270 S.W. 825 (Ky. 1925).

With respect to the issue of whether the trains approaching the crossing customarily gave timely and reasonable signals of their approach, the operator of the train that struck Mr. Gaw's truck testified that it was indeed his custom to sound his whistle as he approached that crossing and that he did so before the accident. The private landowners who lived nearest the crossing testified that sometimes trains sounded their whistles as they approached the crossing, and sometimes they did not, however. Construing the evidence in the light most favorable to the plaintiffs, the court will assume that CSX trains customarily gave reasonable and timely signals of their approach to the crossing. That is not enough, however, to expose CSX to potential liability, however. There must also be sufficient evidence in the record to warrant submission to a jury that Mr. Gaw had come to rely on the signals.

Unfortunately, the court does not have the benefit of knowing what, exactly, Mr. Gaw knew or relied upon with respect to audible alarms that may have been sounded by trains approaching the crossing, and neither the court nor the jury could ever know. The evidence in the record, however, indicates that, to his girlfriend's knowledge, he had only been across the tracks a few times before the accident. That, coupled with the landowners' testimony that trains

-11-

sometimes sounded warnings and sometimes did not, leads the court to find that no reasonable jury could determine that Mr. Gaw relied upon receiving an advance, audible warning as he decided to cross the tracks.

### III.

What happened to Mr. Gaw, Ms. Newton, and their son, Riley, indisputably is a profound tragedy. Not all tragic events can find some measure of redress in the courts, however. This is one such case. After carefully considering the existing law and the evidence provided by all parties, the court concludes that CSX is entitled to judgment in its favor.

The court will enter an order consistent with this memorandum opinion.

DATE:

cc:     counsel of record